IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO

Goura Ndiaye,

                Plaintiff,

      vs.

UNITES STATES OF AMERICA;
CORECIVIC, Inc.;
U.S. Immigration and Customs Enforcement
Officers JOHN AND JANE DOES,

                Defendants.

CASE NO.: _____

**JURY TRIAL DEMANDED**

## COMPLAINT

Plaintiff, Mr. Goura Ndiaye, by and through his attorneys, files this Complaint against the United States of America ("the United States"); CoreCivic, Inc. ("CoreCivic"); and U.S. Immigration and Customs Enforcement Officers John and Jane Does (collectively, "Defendants"), alleging as follows:

## NATURE OF THE ACTION

1. Despite having lived productively in the United States for over 20 years after fleeing racist persecution from his homeland, Mr. Goura Ndiaye was summarily arrested in December 2018 at a routine appointment with U.S. Immigration and Customs Enforcement. After months

1

in detention, he was deported in August 2019 to Mauritania, where his citizenship had been revoked years ago due to his race. At the time of his immigration detention, he was awaiting hip surgery. Mr. Ndiaye has a hip bone that is rotting inside his body. Multiple doctors have diagnosed him with "avascular necrosis," and his necrotic bone has been causing him tremendous pain since 2018. His hip replacement surgery was scheduled for January 2019.

2. During his time in detention, and in violation of numerous internal policies, Defendants and their agents failed to adequately treat his condition. Defendants would not permit him to attend his scheduled surgery while in detention. He saw additional doctors while in detention who also determined that he needed this surgery he needed, but instead of providing the surgery, Defendants gave him Tylenol and anti-depressants. Mr. Ndiaye's condition worsened dramatically in detention, reaching an "advanced" stage of decay and leaving him in agonizing pain. He was then deported to Mauritania, where he does not have the legal ability to access medical care, and where the medical infrastructure could not provide him with adequate medical care in any case.

3. Today, Mr. Ndiaye cannot walk. He cannot work. He can barely stand. His suffering is immense, because Defendants refused to provide him with necessary and adequate medical care while under their supervision.

## THE PARTIES

4. Plaintiff Goura Ndiaye was formerly a resident of the state of Ohio and currently lives in the country of Senegal.

5. The United States of America is a defendant in this action. Its registered agent, the Attorney General of the United States, is located at 950 Pennsylvania Avenue, NW, Washington, D.C. 20530. At the time of the events and omissions giving rise to this lawsuit, the United States

of America acted through its cabinet departments and agencies: U.S. Immigration and Customs

Enforcement (ICE), a federal law enforcement agency under the U.S. Department of Homeland

Security (DHS), and the U.S. Public Health Service (PHS), a division of the U.S. Department of

Health and Human Services (HHS).

6.      Defendant CoreCivic, Inc. ("CoreCivic") is a Maryland corporation with its principal

office address at 2405 York Road, Suite 201, Lutherville Timonium, MD 21093.  Its registered

agent in Ohio is at CT Corporation System, 4400 Easton Commons Way, Suite 125, Columbus,

OH 43219.  At the time of the events and omissions giving rise to this lawsuit, this CoreCivic

entered a contract with ICE to, among other things, house detainees and operate and provide

medical services to detainees at the Northeast Ohio Correctional Center (NEOCC), where Mr.

Ndiaye was held from April 2018 to August 2019, and supervised and implemented such

services. Defendant CoreCivic is responsible for the oversight, supervision, and training of the

staff at NEOCC, including the medical staff who were responsible for caring for Mr. Ndiaye.

7.      Defendants ICE Officers John and Jane Does are the officers, agents, and employees of

ICE who were responsible for Mr. Ndiaye's treatment and medical care while in ICE custody

and not in the custody of other entities, including but not limited to the time he spent in detention

in ICE facilities around the United States and during transit between facilities.  The John and

Jane Does also include ICE agents and others involved in the medical clearance and

determination process as part of his deportation.  Early discovery will identify these individual

defendants.

## JURISDICTION, VENUE, AND CONDITIONS PRECEDENT

8.      This action arises under the Constitution and laws of the United States, including the

Federal Tort Claims Act, 28 U.S.C. §§ 2674 and 1346(b)(1), and the Rehabilitation Act, 29

U.S.C. § 794. As such, this Court has jurisdiction pursuant to 28 U.S.C. § 1331, and over pendent state law claims pursuant to 28 U.S.C. § 1367.

9. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391, as a substantial part of the events or omissions giving rise to this action occurred within the judicial district of the Northern District of Ohio.

10. Mr. Ndiaye has exhausted his claims against the United States by filing an administrative claim under the Federal Tort Claims Act on or about January 9, 2020, and having his claim denied on March 27, 2020. *See* Ex. A (Administrative Complaint); Ex. B (Denial Letter).

### FACTUAL BACKGROUND

#### *Mr. Ndiaye's Persecution in Mauritania Based on Race*

11. Mauritania is a sparsely populated nation of 4.4 million people. It sits at a traditional crossroads between lighter-skinned Berber and Arab ethnic groups to the north and darker-skinned ethnic groups of sub-Saharan African origin to the south. Slavery along that racial divide continues to this day. Large populations of so-called "black Moors," or Arabic-speaking members of sub-Saharan ethnic groups, are enslaved by the dominant "white Moors" of Arab-Berber descent.[1] Thousands more are treated to "slavery-like practices," sexual violence, and unmatched levels of discrimination.[2]

12. In 1989, the Mauritanian government began a program of revoking the citizenship of black Mauritanians on the basis of their race and expelling them from the country.[3] Black

---

[1] Central Intelligence Agency, *The World Factbook 2019 – Mauritania*.

[2] Afua Hirsch, *Black Mauritanians suffer 'slavery-like' conditions, says UN*, The Guardian, Sep. 12, 2013, https://www.theguardian.com/global-development/2013/sep/12/black-mauritania-slavery-un.

[3] Rone Tempest, *In Senegal and Mauritania, Ethnic Conflict Rages Amid Talk of War*, Los Angeles Times, June 3, 1989, https://www.latimes.com/archives/la-xpm-1989-06-03-mn-831-story.html.

Mauritanians were summoned to police stations, subjected to beatings, denied food for days, deprived of their identity cards, and loaded on trucks and sent to neighboring Senegal.[4]  This occurred while groups organized by governmental authorities massacred hundreds of black people in Mauritania's cities.[5]  The government's denaturalization program lasted until 1992, but government-sponsored persecution continued for years, and government-tolerated slavery and discrimination continues to this day.[6]

13.     Mr. Ndiaye, as a black Mauritanian, was subjected to this kind of racial persecution.  In 1990, the government revoked his citizenship and deported him to Senegal.

### *Mr. Ndiaye Lawfully Arrives in the United States, Starts a Business, and Buys a House*

14.     In 2000, Mr. Ndiaye fled from Senegal and lawfully arrived in the United States. He applied for asylum, but his application was denied.  He was granted an Order of Supervision from ICE in 2009.

15.     Mr. Ndiaye lived almost exclusively in the Columbus, Ohio area.  While in Columbus, he worked successfully as an electrician, purchased his own home, and began a family.  He eventually opened his own business as an electrician, which was very successful.

16.     Since 2009, Mr. Ndiaye had dutifully attended his scheduled immigration check-ins under his agreement with ICE without incident.  But at his regular appointment on December 10, 2018, ICE abruptly revoked his supervised release status and arrested him.

---

[4] Human Rights Watch, *HUMAN RIGHTS WATCH WORLD REPORT 1989 – Mauritania*, 1989 https://www.hrw.org/reports/1989/WR89/Mauritan.htm.
[5] *Id*.
[6] ECC Platform Library, *Communal Violence in Mauritania and Senegal 1989-1992*, accessed Jan. 8, 2020, https://library.ecc-platform.org/conflicts/mauritanians-vs-senegalese.

### *Arrest by ICE on the Eve of Surgery*

17. Mr. Ndiaye's surgery was scheduled for January 4, 2019. As a result of his arrest by ICE, this surgery never occurred. He then spent the next eight months in several places of immigration detention, including multiple sheriffs' jails and ICE facilities in Ohio and across the country.

18. Upon the request of ICE, in 2018, Mauritania issued a *laissez-passer* travel document on Mr. Ndiaye's behalf and provided it to the United States government. *Laissez-passer* documents can be used in lieu of a passport to allow for one-way or one-time travel to a country. It did not reinstate Mr. Ndiaye's citizenship, permit him to receive a Mauritanian passport, or convey any rights to him in Mauritania. But with the document, the Mauritanian government would now receive him into the country despite his lack of legal status there. This was a new development since Mauritania denaturalized and deported Mr. Ndiaye in 1990.

19. After his arrest by ICE, Mr. Ndiaye pursued several immigration-related legal actions to prevent his return to Mauritania. He was granted an emergency stay of removal on January 4, 2019, as well as a stay of removal from the Board of Immigration Appeals (BIA), and the *laissez-passer* document eventually expired on March 1, 2019.

20. The Mauritanian government re-issued the *laissez-passer* document on June 21, 2019, and ICE deported Mr. Ndiaye on August 6, 2019.

21. On March 23, 2020, his appeal to the Sixth Circuit of the BIA's denial of a motion to reopen his asylum and withholding of removal claims was denied. *Goura Ndiaye v. William Barr*, No. 19-3524 (6th Cir.).

*Mr. Ndiaye's Avascular Necrosis*

22. Mr. Ndiaye's health issues began in early 2018. Though he could still walk, his left hip would ignite in pain during certain activities, like while driving. As the pain increasingly interfered with everyday life, Mr. Ndiaye went to the doctor. In July 2018, he received a diagnosis of "avascular necrosis" of the bone in his left hip—specifically, the head of his femur.

23. Avascular necrosis is classified as "a chronic, degenerative and progressive" disease, in which the blood supply to a part of the bone has stopped or been dramatically reduced.[7] Without blood, the affected part of the bone dies inside the body. Injuries or certain blood conditions can lead to avascular necrosis, but according to the Mayo Clinic, the underlying cause of this disease is unknown in 25 percent of cases.[8]

24. Once avascular necrosis sufficiently progresses, as it did in Mr. Ndiaye's case, then the treatment for the condition is a total replacement of the affected bone. Dr. Robert Wetzel of the Mount Carmel Health System, Mr. Ndiaye's doctor, recommended this very treatment for him. Mr. Ndiaye had a pre-surgical evaluation for a total hip replacement on August 29, 2018, and Dr. Wetzel determined that he needed to improve certain health indicators, like his blood pressure, before the surgery could occur.

25. With physical therapy, medication, and diet changes, Mr. Ndiaye successfully improved those health indicators for the surgery. He returned to Dr. Wetzel on November 28, 2018 for a final evaluation. At that visit, Dr. Wetzel formally recommended a "left total hip arthroplasty"

---

[7] "Necrosis of the Femoral Head and Health-Related Quality of Life of Children and Adolescents," *Acta Ortop Bras*. 2018; 26(4): 227–230, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6131276/.
[8] Mayo Clinic, "Avascular necrosis," May 5, 2018, https://www.mayoclinic.org/diseases-conditions/avascular-necrosis/symptoms-causes/syc-20369859.

or replacement, and Mr. Ndiaye then scheduled the procedure with surgeon Dr. Steven Cotman for January 4, 2019.

26.     That scheduled surgery never occurred.  Instead, Mr. Ndiaye was arrested by ICE on December 10, 2018 when he attended his regular check-in appointment under the terms of his Order of Supervision.

### *Lack of Health Care at Immigration Detention*

27.     Mr. Ndiaye was detained for eight months, from December 2018 to August 2019.

28.     For the first four months following his arrest, he was moved repeatedly between federal, state, and private facilities in Louisiana, Arizona, and Ohio.  In April 2019, he was moved to the CoreCivic-operated Northeast Ohio Correctional Center (NEOCC) in Youngstown, Ohio, where he was detained until his deportation.

29.     At each facility where Mr. Ndiaye was detained, he reported his diagnosis, his need for surgery, and his high pain levels to the relevant authorities.  While nurses or physicians' assistants employed by Defendants at times took note, Mr. Ndiaye never received adequate treatment for his debilitating condition.

30.     Because of his December 2018 arrest and subsequent detention, Mr. Ndiaye was unable to attend his January 2019 scheduled surgery.  His detainers would not let him attend it.  He remained in debilitating pain, which increased to the point that it caused him to faint in custody on multiple occasions.  But despite his doctors' recommendations, no surgery was ever re-rescheduled.

31.     On March 20, 2019, Mr. Ndiaye was permitted to see a specialist doctor at the TriHealth system in West Chester, Ohio.  There, Dr. Charles Herfel diagnosed what Dr. Wetzel at Carmel had diagnosed some eight months prior: "partial collapse of the femoral head . . . most

compatible with avascular necrosis . . . mild to moderate degenerative change in the left hip joint." A letter included with Mr. Ndiaye's medical notes from that day also states: "Goura was evaluated in office today by Dr. [Scott] Slivka. His left hip needs replaced." But again, he was not permitted to have that surgery while in detention, even with multiple doctors' recommendations and his diagnosed medical need.

32. A review of the NEOCC medical records in Mr. Ndiaye's possession show ten separate occasions on which he discussed his pain and his condition with the appropriate medical authorities: "left hip pain," "chronic L hip pain" and "left leg pain hip issue." In Mr. Ndiaye's words, as recorded by NEOCC: "I have left hip pain and was to have it replaced before I came here," and "I have lot of pain to my left hip and down my leg. Hurts to walk, sleep at night."

33. Not only were the authorities aware of his condition, but they also confirmed it with a third-party x-ray on May 9, 2019. Dr. James Esser of Cavalier Mobile X-Ray reviewed Mr. Ndiaye's x-ray and wrote: "crescentic subchondral sclerotic and cystic change and partial collapse of the weightbearing aspect of the femoral head appears consistent with advanced AVN [avascular necrosis]." That his diagnosis had deteriorated from "mild to moderate" in March to "advanced" in May demonstrates how badly Mr. Ndiaye's health had declined while in detention. His condition had objectively worsened.

34. An entry on Mr. Ndiaye's inmate medical chart from May 22, 2019 goes into further detail about ICE's awareness of his condition and the appropriate treatment. It accepts his diagnosis of "Avascular Necrosis of the left hip" and acknowledges that alternative routes of treatment had failed: "Detainee was scheduled to undergo his total hip arthoplast [hip replacement] on 1/4/2019 after unsuccessful trial of NSAIDS, coricosteriod treatment, and physical therapy and reccomendation [sic] from Orthopaedic physician."

35.    Moreover, ICE Health Service Corps are responsible for providing direct care to the detainees in ICE's care—including Mr. Ndiaye. ICE Health Service Corps includes personnel from PHS.

36.    ICE, PHS, its contractors at NEOCC, were thus clearly aware of Mr. Ndiaye's condition, its advanced stage, the immense pain it caused, the multiple doctors' recommendations that the appropriate treatment was a hip replacement, and the failure of alternatives to surgery.

37.    But instead of allowing Mr. Ndiaye to receive the treatment his doctors recommended, detention authorities repeated an ineffective, insufficient course of treatment that had already failed to address Mr. Ndiaye's necrotic tissue: Tylenol and other anti-inflammatories. He was also prescribed anti-depressants for their potential pain management secondary effects, though he refused them as inadequate. In terms of treatment for advanced avascular necrosis that caused pain to the point of fainting, Mr. Ndiaye was plainly correct.

### *ICE's Failure to Abide by Its Internal Policies*

38.    ICE and CoreCivic as ICE's contractor at NEOCC violated ICE's internal medical standards by failing to provide Mr. Ndiaye proper medical care during his detention. ICE regulates its own treatment under a series of internal policies: the 2000 National Detention Standards (NDS), the 2008 Performance-Based National Detention Standards (PBNDS) and the 2011 PBNDS (amended in 2016). Together, there is no doubt that ICE has committed itself to ensuring that its detainees receive the medical care recommended by their treating physicians.

39.     ICE standards state that each detainee is ensured "access to appropriate and necessary" medical care,[9] specifically including "treatment"[10] and "specialized health care."[11] In particular, the standards require every facility to provide detainees "[m]edically necessary and appropriate medical . . . services," "[c]omprehensive, routine and preventive health care, as medically indicated," "[s]pecialty health care," "[t]imely responses to medical complaints," and "hospitalization as needed within the local community."[12] The appropriate medical treatment is determined by health care specialists.[13] If providing the appropriate, doctor-recommended treatment for avascular necrosis was beyond the resources of the detention facility, policy dictated that Mr. Ndiaye should have been transferred.[14] As the standards put it, in short: "Health care needs will be met."[15]

40.     The chronic nature of Mr. Ndiaye's avascular necrosis should have elevated his importance within the ICE medical framework. Under ICE's standards, "[d]etainees with chronic conditions shall receive care and treatment, as needed."[16] Especially relevant to Mr.

___

[9] U.S. Immigration and Customs Enforcement [ICE], "2008 Operations Manual ICE Performance-Based National Detention Standards," 2008, https://www.ice.gov/detention-standards/2008; ICE, "2011 Operations Manual ICE Performance-Based National Detention Standards, Revised December 2016," Dec. 2016, https://www.ice.gov/detention-standards/2011.

[10] ICE, "2008 Operations Manual"; ICE, "2011 Operations Manual".

[11] ICE, "2000 Detention Operations Manual," 2000, https://www.ice.gov/detention-standards/2000. While ICE has also released its "2019 National Detention Standards for Non-Dedicated Facilities," they do not appear to have been in effect at the times and in the locations applicable to Mr. Ndiaye.

[12] ICE, "2011 Operations Manual."

[13] "A health care specialist shall determine medical treatment, except when there is disagreement on the type or extent of treatment that is medically necessary." ICE, "2000 Detention Operations Manual."

[14] "A detainee who is determined to require health care beyond facility resources shall be transferred in a timely manner to an appropriate facility." ICE, "2008 Operations Manual;" ICE, "2011 Operations Manual."

[15] ICE, "2008 Operations Manual."

[16] ICE, "2011 Operations Manual."

Ndiaye's progressively disabling disease, "[d]etainees with chronic conditions will receive care and treatment for conditions where non-treatment would result in negative outcomes or permanent disability as determined by the clinical medical authority."[17]  This care must be "in accordance with a written treatment plan conforming to accepted medical practices for the condition in question, approved by a licensed physician."[18]

41.     But Mr. Ndiaye's doctors before and during detention (i.e. "medical authorities") recommended a hip replacement as necessary treatment for his avascular necrosis (i.e. "care and treatment, as needed"), and the effects of withholding that necessary surgery have been debilitating (i.e. non-treatment resulting in "negative outcomes or permanent disability").  Yet Mr. Ndiaye never received the care for his chronic condition to which ICE standards would entitle him.

### *Deportation Without Appropriate Review, to Country Without Access to Medical Care*

42.     In August 2019, after almost eight months in U.S. custody, ICE deported Mr. Ndiaye to Mauritania.

43.     The circumstances surrounding the deportation further underscore ICE's awareness of his need for treatment.  Per its own protocol, ICE was required to initiate a pre-deportation internal process which results in a formal "determination letter" advising whether medical care is available in a given destination country and "taking into consideration the ease of access and affordability."[19]  No such letter appears to have been written.  If it had, it would have necessarily discussed the total lack of appropriate medical infrastructure in Mauritania—and how Mr.

---

[17] *Id.*

[18] *Id.*

[19] ICE, "Availability of Health Care," *ICE Health Service Corps*, Mar. 18, 2016, http://www.documentcloud.org/documents/6025417-IHSC-Policy-Availability-of-Health-Care.html.

Ndiaye would be unable to access any present medical services due to his race and lack of citizenship.

44.     Mr. Ndiaye was also told by ICE officers that he was leaving detention and travelling elsewhere to finally obtain appropriate medical care.  ICE officers purportedly told him this because his need was so evident, and the only reasonable course of action at that point would be to allow him to receive his necessary hip replacement.

45.     But instead, ICE sent Mr. Ndiaye to a nation where he had no citizenship rights due to his race.  In Mauritania, basic rights and access to public services are contingent on the possession of state identification papers, which require legal status or citizenship.  But Mr. Ndiaye is prohibited from working and owning property in Mauritania, and again, his access to public services like hospitals is extremely curtailed.  These formalistic restrictions are both separate from and linked to the racist discrimination, abuse, and de facto enslavement that dark-skinned people like Mr. Ndiaye face in Mauritania.

46.     Yet ICE still granted him medical clearance for deportation, in apparent disregard of its own internal policy requiring removal officers to determine the availability of health care in destination countries.[20]

47.     As such, and in a repeat of his experience in 1990, Mr. Ndiaye was again forced to flee from Mauritania to Senegal in 2019.  He is currently staying with his daughter in Senegal; she was born Mauritania, was forced to move with him in 1990 to Senegal when she was three, and stayed in Senegal when he came to the United States.  While he still cannot legally work and his access to medical services or basic medicine remains extremely limited, Senegalese society does not subject him to the discrimination based on his race that he experienced in Mauritania.

---

[20] *Id.*

48.	But his health has only deteriorated.  Today, Mr. Ndiaye can barely move.  He requires the use of a cane to ambulate at all, which was not the case before he entered detention.  And even minor movement with the cane is accompanied by extreme and debilitating pain, which shoots all the way down his leg to his calf with every step he takes.

49.	Indisputably, this steep decline came about during Mr. Ndiaye's time in detention: his condition was left untreated, was exacerbated by conditions in detention, and worsened from "mild to moderate" to "advanced."  He suspects that this is in no small part a result of the painfully hard beds on which he was forced to sleep and spend many of his waking hours.

50.	Mr. Ndiaye cannot measure his exact level of deterioration because he was deported to a country without adequate medical infrastructure to assess his condition and then was forced to flee to another such county.  As discussed above, ICE medically cleared him to be shipped to Mauritania despite the total absence of adequate medical facilities there, and despite his status in Mauritania as a non-citizen who cannot access services even if they existed.  This violated ICE's own standards, under which it pledged to provide detainees under its control with appropriate medical care as directed by treating physicians—especially if their conditions were chronic.

## COUNT I – Medical Negligence under the FTCA

*Against the United States*

51.	Mr. Ndiaye incorporates by reference the allegations contained in paragraphs 1-50 as if fully set forth herein.

52.	The Federal Tort Claims Act (FTCA) waives the United States' sovereign immunity and permits damages claims for torts committed by government employees "acting within the scope of [their] office or employment."  28 U.S.C. § 2671 et seq.  Under the FTCA, the United States is

liable for tort claims in the same manner and to the same extent as a private individual would be under the circumstances.  28 U.S.C. § 2674.

53.     The applicable tort law in an FTCA claim is the law of the state where the act or omission occurred.  Ohio law applies here.

54.     Under Ohio law, all Defendants, including the United States, had a duty to provide medical care to Mr. Ndiaye while in detention.  As ICE and PHS are divisions or agencies of the United States, the United States is directly liable for their acts, omissions, and conduct under the FTCA.

55.     This duty to provide medical care is clarified in ICE's internal policies, including but not limited to: the 2000 National Detention Standards (NDS), the 2008 Performance-Based National Detention Standards (PBNDS), and the 2011 PBNDS (amended in 2016).  Other defendants who detained Mr. Ndiaye were bound by and held to the standards in ICE's policies.

56.     The United States, CoreCivic, and other detention contractors each had concurrent and overlapping responsibility for Mr. Ndiaye during his detention.

57.     Although ICE contracted with CoreCivic and others for certain services, the United States retained separate, non-delegable duties including but not limited to: (i) its duties to Mr. Ndiaye as his detainer when he was not detained at the contract facilities, especially in the medical context; (ii) the duty to supervise its own agents and employees; and (iii) the duty to oversee its contractors and to exercise reasonable care in selecting them.

58.     In direct violation of the foregoing duties, while Mr. Ndiaye was in the custody of the United States and its agents and employees, it failed to provide him with appropriate medical care and showed a deliberate indifference to his serious medical needs.  These agents include but are not limited to agents of ICE and PHS.

59. As a direct and proximate result of the United States and its agents' negligent and reckless acts, omissions, and conduct, Mr. Ndiaye's health deteriorated significantly. They should have followed ICE's own internal policies and allowed Mr. Ndiaye to receive the appropriate treatment as determined by his doctors: a total hip replacement.

60. Under the care of the United States, Mr. Ndiaye's condition dramatically worsened from mild/moderate to advanced avascular necrosis. While he entered detention able to walk without assistance, he can barely walk even with a cane today. He can no longer physically work because every movement he makes is accompanied by tremendous pain, and the pain has caused him to lose consciousness on multiple occasions. Mr. Ndiaye has suffered extreme mental and emotional pain and distress, medical expenses, the loss of the potential to earn a living, and other harms.

## COUNT II – Medical Negligence under State Tort Law

*Against CoreCivic*

61. Mr. Ndiaye incorporates by reference the allegations contained in paragraphs 1-60 as if fully set forth herein.

62. As Mr. Ndiaye's detainer, CoreCivic and its agents had the same duty of care to him under Ohio law that the United States did: to provide adequate medical care while in detention. They were also held to the same standards put forth in ICE's internal policies.

63. CoreCivic also breached this duty by withholding the appropriate medical treatment from Mr. Ndiaye when he was under its control, and he never received adequate medical care while in its detention. As a direct and proximate result of its negligent and reckless acts, omissions, and conduct, Mr. Ndiaye's condition seriously declined: he can effectively no longer walk, and his pain is both excruciating and constant. Again, his inability to walk and the pain from his

necrotic femur has led to extreme mental and emotional pain and distress, medical expenses, the loss of the potential to earn a living, and other harms.

### COUNT III – Negligent Employee Hiring, Training, and Supervision under the FTCA

*Against the United States*

64.     Mr. Ndiaye incorporates by reference the allegations contained in paragraphs 1-63 as if fully set forth herein.

65.     While in custody, Mr. Ndiaye was forced to rely on Defendants' medical staff and other employees to care for his medical needs.  Mr. Ndiaye had no control or choice in his medical care.  Under Ohio law, Defendants had a duty to exercise reasonable care in hiring, supervising, and training their staffs—in particular, their medical professionals, as the potential harm they could do through their own negligence was foreseeably greater.

66.     At each circumstance of Mr. Ndiaye's detention, the United States' employees and agents failed to ensure that Mr. Ndiaye received medically necessary and appropriate treatment while he was in their custody.  This was despite multiple doctors' recommendations and in direct violation of ICE's own internal policies.

67.     The United States also had custody of Mr. Ndiaye independent of his detention by CoreCivic or other contractors.  During those times and through ICE and PHS, it had the duty to hire, train, and supervise employees capable of fulfilling their medical obligations.  ICE and PHS also failed to fulfill those obligations, and they failed to follow ICE's internal policies which reflected those obligations.

68.     Because the United States either knew or should have known of the neglect and/or lack of training that resulted in Mr. Ndiaye's outrageous health outcome, it was negligent in training and supervising its own medical staff.  Moreover, ICE and PHS's apparent culture of negligence and

disinterest in patient care indicates that those employees should not have been hired in the first place.

69.     The United States breached its duty to exercise reasonable care in hiring, training, and supervising their relevant employees and medical professionals.  As evidenced by their failure to adequately treat Mr. Ndiaye, those individuals proved unqualified and unfit for the duties and responsibilities of their positions.  Had better hiring, training, or supervising practices occurred, Mr. Ndiaye's medical needs would have been addressed.

70.     This breach of duty was the proximate cause of the damages Mr. Ndiaye's suffered, including the deterioration of his avascular necrosis—damages that were entirely foreseeable by not providing him with adequate care.  This deterioration resulted in tremendous pain and a profound loss of life function for Mr. Ndiaye.

71.     Under the FTCA, the United States is liable for torts under Ohio law such at this.

**COUNT IV – Negligent Employee Hiring, Training, and Supervision under State Tort Law**

*Against CoreCivic*

72.     Mr. Ndiaye incorporates by reference the allegations contained in paragraphs 1-71 as if fully set forth herein.

73.     Mr. Ndiaye repeatedly sought medical assistance for his pain, but rather than abide by their duty to him and/or follow ICE policies to arrange for proper medical treatment, CoreCivic employees only provided him with meager remedies like Tylenol and anti-depressants.  This resulted in Mr. Ndiaye suffering extreme pain and almost eliminating his ability to ambulate.

74.     Employees of CoreCivic performed their jobs at a dire level of unpreparedness or incompetence, as evidenced by the woefully inadequate treatment options offered to Mr. Ndiaye.  As this incompetence was exhibited within the scope of their employees' jobs, CoreCivic knew

or should have known that its employees had failed to provide adequate supervision and training of their employees.

75.     Had CoreCivic hired, trained, and/or supervised its employees in accordance with its duties to do so, those employees would have known to provide adequate medical care to Mr. Ndiaye and thus prevent the horrendous condition he finds himself in today.

## COUNT V – Intentional Infliction of Emotional Distress under the FTCA

### *Against the United States*

76.     Mr. Ndiaye incorporates by reference the allegations contained in paragraphs 1-75 as if fully set forth herein.

77.     ICE had internal policies governing the medical care of its detainees, including provisions that stated that ICE "negotiate and keep current arrangements with nearby medical facilities or health care providers to provide required health care not available within the facility." ICE deliberately violated those policies.

78.     ICE knew or should have known that its extreme and outrageous actions, including those that disregarded its internal policies its various duties of care regarding the medical treatment of its detainees, would cause emotional distress among detainees like Mr. Ndiaye—especially those who, like him, suffered from a chronic debilitating condition.

79.     Similarly, PHS was responsible for Mr. Ndiaye's direct medical treatment. PHS's failure to provide adequate medical care was an extreme and outrageous aberration of its duties to Mr. Ndiaye. PHS knew or should have known that such an aberration would cause emotional distress among detainees like Mr. Ndiaye.

80.     As ICE and PHS are divisions or agencies of the United States, the United States is directly liable for their acts, omissions, and conduct under the FTCA.

- 19 -

81.     In Mr. Ndiaye's specific instance, he had hip replacement surgery scheduled for January 4, 2019.  He advised Defendants of this appointment, but they ignored it.  Throughout his time in detention, he repeatedly sought appropriate medical care but was denied the necessary surgery to alleviate his pain and walk effectively again.  Even doctors who examined Mr. Ndiaye while he was in detention agreed that hip replacement surgery was required.  Yet Defendants made no efforts to provide Mr. Ndiaye with receiving the treatment he required, and in fact withheld it from him.

82.     As a result of these intentional and negligent actions committed by the United States, Mr. Ndiaye has suffered severe emotional distress: his health declined in detention to the point where he would faint from pain and could not walk, and he is presently unable to receive the appropriate treatment himself.

83.     Mr. Ndiaye's condition and pain have driven him to extreme grief.  He cannot walk, much less work.  This continued and worsened throughout his time in detention, and as he was deported to a country without adequate medical care.  Moreover, his lack of access to medical care as a journey by itself was devastating.  He was constantly told by medical professionals employed by the Defendants that he could not receive the care that his doctors directed, even when those same doctors were provided by those very entities.

84.     To withhold vital medical care from a vulnerable man whose wellbeing lies fully in the hands of his detainers is outrageous and extreme.

85.     Under the FTCA, the United States is liable for torts under Ohio law such at this.

## COUNT VI – Intentional Infliction of Emotional Distress under State Tort Law

*Against CoreCivic*

86.     Mr. Ndiaye incorporates by reference the allegations contained in paragraphs 1-85 as if fully set forth herein.

87.     CoreCivic also had responsibility for Mr. Ndiaye's direct medical treatment when it detained him.  Its international or reckless failure to provide adequate medical care— in clear violation of ICE's relevant policies—was extreme and outrageous, and a tragic aberration of its duties to Mr. Ndiaye.

88.     CoreCivic also knew or should have known that failing to provide or choosing to withhold essential medical care would cause emotional distress among detainees like Mr. Ndiaye—especially those who, like him, suffered from a chronic debilitating condition.

89.     Finally, to taunt Mr. Ndiaye by acknowledging his condition and having him continually receive an accurate diagnosis but refuse to treat that diagnosis—a pattern of activity for CoreCivic—underscore how outrageous and extreme his treatment was.

90.     As a result of CoreCivic's intentional and reckless actions, Mr. Ndiaye has suffered severe emotional distress as his health condition worsened.

## COUNT VII – Gross Negligence under the FTCA

*Against the United States*

91.     Mr. Ndiaye incorporates by reference the allegations contained in paragraphs 1-90 as if fully set forth herein.

92.     The United States provided grossly inadequate treatment when it directly detained Mr. Ndiaye, and it failed to address or prevent the dire medical circumstances that Mr. Ndiaye faced

- 21 -

when detained by the United States' contractors, including CoreCivic. This constitutes "slight care" at best.

93.     Even careless people would, at some point during Mr. Ndiaye's extensive detention, attempt to address the root cause of his debilitating pain.  They may have done so in a careless manner, but they would have attempted the task as required by common sense, medical ethics, and ICE's internal policies.  The United States never did so, and it never interceded to have its contractors do so—even though it had responsibility for Mr. Ndiaye's care.  As such, the United States effectively failed to exercise any care whatsoever.

94.     Under the FTCA, the United States is liable for torts under Ohio law such at this.

### COUNT VIII – Gross Negligence under State Tort Law

*Against CoreCivic*

95.     Mr. Ndiaye incorporates by reference the allegations contained in paragraphs 1-91 as if fully set forth herein.

96.     Mr. Ndiaye had a bone rotting inside his body, but CoreCivic refused to provide adequate treatment to him despite its clear duty and ICE's internal policies.  Instead, it provided him with Tylenol and antidepressants as his primary form of treatment.  The mildness of these treatments is wildly out of step with the severity of his condition.  This constitutes "slight care" at best.

97.     Again, even careless people would, at some point during Mr. Ndiaye's extensive detention, attempt to address the root cause of his debilitating pain—especially considering that ICE's internal policies dictated as much for its contractors, including CoreCivic. As such, CoreCivic clearly failed to exercise any care whatsoever.

**COUNT IX – Negligent Contractor Selection, Retention, and Oversight under the FTCA**

*Against the United States*

98.     Mr. Ndiaye incorporates by reference the allegations contained in paragraphs 1-97 as if fully set forth herein.

99.     The United States contracted with CoreCivic and other entities for immigrant detention and other related services.  Those contractors, including CoreCivic, failed to fulfill their various duties of care to Mr. Ndiaye.

100.    Moreover, their violations of the duties of care were the result in part of systemic neglect and malfeasance by those entities.  These entities exhibited a clear pattern of medical malfeasance against detainees like Mr. Ndiaye.

101.    The United States knew or should have known about its contractors' various failures and inabilities to fulfill their duties of care to Mr. Ndiaye and other detained individuals.  It knew or should have known that CoreCivic and would fail to provide adequate medical care to its detainees including Mr. Ndiaye, for whom the United States was ultimately responsible.  As such, the United States was negligent in selecting and retaining these contractors.

102.    Moreover, agents and employees of the United States failed to adequately supervise and oversee its contractors, including CoreCivic, to confirm that their staff were fulfilling their medical obligations.

103.    To the extent that contractor selection and oversight are considered discretionary functions of ICE, ICE failed to exercise due care in doing so and is otherwise ineligible for the FTCA's discretionary function exception.

104.    Accordingly, the United States is directly liable for injuries resulting from its own negligence in selecting, retaining, and overseeing its contractors.

105.    Under the FTCA, the United States is liable for torts under Ohio law such at this.

## COUNT X – Bivens Action

*Against ICE Officers John and Jane Does*

106.     Mr. Ndiaye incorporates by reference the allegations contained in paragraphs 1-105 as if fully set forth herein.

107.     Federal prisoners and detainees may bring actions in federal court for equitable relief—injunctions and declaratory judgments—directly under the Constitution, and they may seek damages under certain "implied" causes of action for constitutional torts.  *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 396-97 (1971).  A *Bivens* action is an implied damages remedy to redress federal agents' constitutional violations.  *Id*.

108.     Individual federal agents ICE Officers John and Jane Does were responsible for Mr. Ndiaye's health, safety, medical treatment, and basic wellbeing while in the direct custody of the United States.  They were also responsible for overseeing his detention with CoreCivic and other detention contractors to confirm that those third parties abided by these same responsibilities to Mr. Ndiaye.

109.     These agents were well aware of Mr. Ndiaye's tremendous pain and the diagnosis he received from multiple doctors of avascular necrosis.  But at no point did the responsible ICE Officers John and Jane Does address, mitigate, or correct the severe lack of care Mr. Ndiaye received in direct ICE detention or while detained with those contracting entities.

110.     Moreover, ICE Officers John and Jane Does made the decision to deport Mr. Ndiaye without performing an adequate review of his medical needs as ICE's own internal policies require.  This decision resulted in Mr. Ndiaye's deportation to a country where he was not a citizen, which did not have adequate medical infrastructure for his condition, and in which he would not be able to access medical care in any case due to his race.

111. It was a violation of Mr. Ndiaye's constitutional rights to allow his condition to worsen while in detention, refuse to treat it, refuse to let him receive pre-planned treatment for it, and then deport him to a country where he cannot receive necessary care in contradiction of ICE's own internal policies. Specifically, ICE Officers John and Jane Does were responsible for the deprivation of the right to adequate medical care while in detention, the right to be free from cruel and unusual punishment, and the right to due process under the Fifth Amendment.

## COUNT XI – Violations of 29 U.S.C. § 794, the Rehabilitation Act

*Against CoreCivic*

112. Mr. Ndiaye incorporates by reference the allegations contained in paragraphs 1-111 as if fully set forth herein.

113. Section 504 of the Rehabilitation Act prohibits discrimination on the basis of disability in (1) any program or activity receiving federal financial assistance; or (2) under any program or activity conducted by any Executive agency or the United States Postal Service. 29 U.S.C. § 794(a).

114. CoreCivic received federal financial assistance under its agreements with ICE for the purpose of immigration detention activities. Mr. Ndiaye was detained by CoreCivic pursuant to those activities.

115. The Rehabilitation Act defines a disability as "a physical or mental impairment that substantially limited one or more major life activities." The Act defines "major life activities" as including without limitation "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12102.

116.    Mr. Ndiaye's avascular necrosis constitutes a disability under the Rehabilitation Act, as it is a physical impairment that, among its other effects, substantially limits his ability to care for himself, perform manual tasks, sleep (due to the pain), walk, stand, lift, bend, work, interact with his environment, and otherwise ambulate.

117.    Mr. Ndiaye was denied access to adequate medical care on the basis of this disability. Other detainees had the right to sufficient medical care for their conditions, and Mr. Ndiaye did not for his.

118.    Instead, CoreCivic refused to provide adequate medical services to Mr. Ndiaye.  His condition of avascular necrosis was diagnosed by doctors both prior to and during his detention. Those doctors recommended a hip replacement as an appropriate treatment.  One such treatment had been scheduled for during his detention.  But at no point was Mr. Ndiaye permitted to receive adequate medical care.  Instead, he was left to languish in incredible and increasing agony as his bone rotted inside his body, provided with a pittance of relief in the form of Tylenol and anti-depressants.

119.    This treatment is demonstrably different from that of Mr. Ndiaye's peers in detention, who were provided with reasonable and adequate levels of medical care commensurate to their conditions.  Because of the specific nature of Mr. Ndiaye's condition, appropriate care was withheld from him by CoreCivic throughout his detention.

## **PRAYER FOR RELIEF**

        **WHEREFORE**, Plaintiff Goura Ndiaye respectfully requests the following relief:

1.  Compensatory damages in an amount no less than $5 million;

2.  Mandatory permanent injunctive relief allowing Mr. Ndiaye to travel to the United States and obtain appropriate medical treatment;

3.  Punitive damages;

4.   Past and potential lost wages;

5.   Costs for this lawsuit, including reasonable attorneys' fees; and

6.   Any other relief deemed just by the Court.

### JURY DEMAND

Plaintiff demands a trial by jury on all issues.

Dated: July 31, 2020                          Respectfully submitted,


                                              */s/ Austin N. Davis*
                                              Austin N. Davis (0099185)
                                              Ruth E. Hartman (0078860)
                                              Email: andavis@bakerlaw.com
                                              Email: rhartman@bakerlaw.com
                                              BAKER & HOSTETLER LLP
                                              Key Tower
                                              127 Public Square, Suite 2000
                                              Cleveland, OH  44114-1214
                                              Telephone:   216.621.0200
                                              Facsimile:    216.696.0740

                                              *Attorneys for Mr. Goura Ndiaye*