# Exhibit A

# BakerHostetler

Baker&Hostetler LLP

Key Tower
127 Public Square, Suite 2000
Cleveland, OH 44114-1214

T 216.621.0200
F 216.696.0740
www.bakerlaw.com

Ruth E. Hartman
direct dial: 216.861.7309
rhartman@bakerlaw.com

Austin N. Davis
direct dial: 216.861.6050
andavis@bakerlaw.com

January 9, 2020

**VIA CERTIFIED MAIL**

U.S. Department of Health and Human Services
Office of the General Counsel
200 Independence Ave., S.W.
Washington, D.C. 20201

U.S. Immigration and Customs Enforcement
Office of the Principal Legal Advisor (OPLA)
500 12th St., SW
Washington, D.C. 20024

U.S. Department of Homeland Security
Office of the General Counsel
925 Keynote Circle
Room 201
Brooklyn Heights, Ohio 44131
E-mail: ogc@hq.dhs.gov

Dear Sir or Madam:

Please find enclosed an administrative claim against the United States government under
the Federal Tort Claims Act regarding medical care that was properly recommended by attending
physicians but withheld during immigration detention in violation of internal policies, as well the
extreme pain and suffering experienced as a result.

We represent Mr. Goura Ndiaye, and we serve this administrative claim on his behalf.
Mr. Ndiaye is a 60-year-old man, who was deported from his home country of Mauritania in
1990 after it revoked his citizenship due to his race and ethnicity in 1989. He arrived lawfully in
the United States in 2000 and lived here peacefully under a supervised release agreement. He
started a business, owned a home, and raised his U.S. citizen-children in the Columbus, Ohio
area until his detention in 2018 and deportation in 2019.

*Atlanta   Chicago   Cincinnati   Cleveland   Columbus   Costa Mesa   Denver   Houston*
*Los Angeles   New York   Orlando   Philadelphia   San Francisco   Seattle   Washington, DC*

U.S. Department of Health and Human Services
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security
January 9, 2020
Page 2

In mid-2018, Mr. Ndiaye was diagnosed with "avascular necrosis" in his left hip: part of his hip bone had died inside his body, and more bone was dying every day.  Mr. Ndiaye was plagued by constant pain and increasing limitations on his mobility as his necrotic area expanded.  While some medical regimens can ease the symptoms of avascular necrosis, after a point, the only suitable treatment is a total hip replacement.  This is exactly what Mr. Ndiaye's doctors had recommended, and his surgery was scheduled for January 4, 2019. But before the surgery could occur, his supervised release was abruptly revoked, and he was arrested by ICE at his regularly scheduled appointment on December 10, 2018.  He was not permitted to attend his surgery while in detention.

Mr. Ndiaye's languished in detention from December 2018 to August 2019, and his condition measurably declined.  Doctors who examined him during this period documented in their medical notes the progressive impact of the disease.  He started with a "mild to moderate" case of avascular necrosis, and while he experienced significant pain, he could still ambulate independently.  But by the time of his deportation, his condition had become "advanced," he could barely move even with the assistance of a cane, and he had fainted from the pain on multiple occasions.  Simple movements were excruciating, and everyday function—much less the possibility of holding a full-time job once released—was unthinkable.

The injuries and suffering that resulted from ICE's withholding of this appropriate medical care were entirely foreseeable.  First, Mr. Ndiaye had informed each detention authority of his hip problems and his doctors' recommendations for a total hip replacement.  Each authority was aware that he had a serious, painful, disabling condition in need of treatment.  Then, while in detention, he saw additional doctors who again recommended a total hip replacement as the appropriate treatment for his avascular necrosis.  ICE medical policies and standards also require detainees to receive all appropriate and necessary medical treatment as determined by a treating physician.  In this case, however, the extent of the care that ICE provided was Tylenol and anti-depressants, despite doctors' unambiguous determination that the appropriate medical treatment was a total hip replacement.

Mr. Ndiaye was then deported to Mauritania in August 2019, the same country where his citizenship was revoked on the basis on his race.  Citizenship in Mauritania is required to function in the public sphere or access basic services—and in any case, the medical infrastructure in Mauritania is not developed enough to provide him with anything resembling appropriate medical care.  He fled to Senegal, where he had been deported by the Mauritanian government in 1990 due to his race (despite his lack of citizenship there) and where his daughter, who was deported with him in 1990, still lives today.  But even with the reduced threat of racial discrimination, he cannot provide for himself because his untreated condition prevents him from ambulating freely.  He spends his days in debilitating pain because ICE ignored his doctors' orders, neglected its own medical policies, and refused to treat his necrotic bone tissue.

We look forward to hearing about an early resolution of Mr. Ndiaye's claims from appropriate government attorneys.  All medical records regarding Mr. Ndiaye referenced herein

U.S. Department of Health and Human Services
U.S. Immigration and Customs Enforcement
U.S. Department of Homeland Security
January 9, 2020
Page 3

are available upon request.  Absent a consensual resolution of Mr. Ndiaye's claims, we will pursue litigation against the United States government and other parties liable for wrongfully preventing Mr. Ndiaye from receiving appropriate medical care in detention and causing him tremendous pain and suffering.

Sincerely,

Ruth E. Hartman
Partner

Austin N. Davis
Associate

Enclosures (Claim Authorization Form, FTCA Form 95 Complaint, Attachment)

4837-1440-0176.1

| CLAIM FOR DAMAGE, INJURY, OR DEATH | INSTRUCTIONS: Please read carefully the instructions on the reverse side and supply information requested on both sides of this form. Use additional sheet(s) if necessary. See reverse side for additional instructions. | FORM APPROVED OMB NO. 1105-0008 |
|---|---|---|

| 1. Submit to Appropriate Federal Agency: | 2. Name, address of claimant, and claimant's personal representative if any. (See instructions on reverse). Number, Street, City, State and Zip code. |
|---|---|
| U.S. Department of Homeland Security<br>U.S. Immigration and Customs Enforcement<br>U.S. Department of Health and Human Services | Goura Ndiaye, c/o Ruth Hartman and Austin Davis, Baker & Hostetler LLP<br>127 Public Square, Suite 2000<br>Cleveland, OH 44114 |

| 3. TYPE OF EMPLOYMENT | 4. DATE OF BIRTH | 5. MARITAL STATUS | 6. DATE AND DAY OF ACCIDENT | 7. TIME (A.M. OR P.M.) |
|---|---|---|---|---|
| ☐ MILITARY  ☒ CIVILIAN | 03/29/1959 | Unmarried | See attachment. | See attachment. |

**8. BASIS OF CLAIM** (State in detail the known facts and circumstances attending the damage, injury, or death, identifying persons and property involved, the place of occurrence and the cause thereof. Use additional pages if necessary).

See attachment.

**9. PROPERTY DAMAGE**

NAME AND ADDRESS OF OWNER, IF OTHER THAN CLAIMANT (Number, Street, City, State, and Zip Code).

Not applicable.

BRIEFLY DESCRIBE THE PROPERTY, NATURE AND EXTENT OF THE DAMAGE AND THE LOCATION OF WHERE THE PROPERTY MAY BE INSPECTED. (See instructions on reverse side).

Not applicable.

**10. PERSONAL INJURY/WRONGFUL DEATH**

STATE THE NATURE AND EXTENT OF EACH INJURY OR CAUSE OF DEATH, WHICH FORMS THE BASIS OF THE CLAIM. IF OTHER THAN CLAIMANT, STATE THE NAME OF THE INJURED PERSON OR DECEDENT.

See attachment.

**11. WITNESSES**

| NAME | ADDRESS (Number, Street, City, State, and Zip Code) |
|---|---|
| See attachment. | |

**12. (See instructions on reverse). AMOUNT OF CLAIM (in dollars)**

| 12a. PROPERTY DAMAGE | 12b. PERSONAL INJURY | 12c. WRONGFUL DEATH | 12d. TOTAL (Failure to specify may cause forfeiture of your rights). |
|---|---|---|---|
| 0.00 | 5,000,000 | 0.00 | 5,000,000 |

I CERTIFY THAT THE AMOUNT OF CLAIM COVERS ONLY DAMAGES AND INJURIES CAUSED BY THE INCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM.

| 13a. SIGNATURE OF CLAIMANT (See instructions on reverse side). | 13b. PHONE NUMBER OF PERSON SIGNING FORM | 14. DATE OF SIGNATURE |
|---|---|---|
| Ruth Hartman (see claim authorization) | 216.861.7309 | 1/9/20 |

| CIVIL PENALTY FOR PRESENTING FRAUDULENT CLAIM | CRIMINAL PENALTY FOR PRESENTING FRAUDULENT CLAIM OR MAKING FALSE STATEMENTS |
|---|---|
| The claimant is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages sustained by the Government. (See 31 U.S.C. 3729). | Fine, imprisonment, or both. (See 18 U.S.C. 287, 1001.) |

Authorized for Local Reproduction
Previous Edition is not Usable

95-109

NSN 7540-00-634-4046

STANDARD FORM 95 (REV. 2/2007)
PRESCRIBED BY DEPT. OF JUSTICE
28 CFR 14.2

## INSURANCE COVERAGE

In order that subrogation claims may be adjudicated, it is essential that the claimant provide the following information regarding the insurance coverage of the vehicle or property.

15. Do you carry accident Insurance? ☐ Yes   If yes, give name and address of insurance company (Number, Street, City, State, and Zip Code) and policy number. ☒ No

16. Have you filed a claim with your insurance carrier in this instance, and if so, is it full coverage or deductible? ☐ Yes ☒ No

17. If deductible, state amount.

0.00

18. If a claim has been filed with your carrier, what action has your insurer taken or proposed to take with reference to your claim? (It is necessary that you ascertain these facts).

Not applicable.

19. Do you carry public liability and property damage insurance? ☐ Yes   If yes, give name and address of insurance carrier (Number, Street, City, State, and Zip Code). ☒ No

## INSTRUCTIONS

**Claims presented under the Federal Tort Claims Act should be submitted directly to the "appropriate Federal agency" whose employee(s) was involved in the incident. If the incident involves more than one claimant, each claimant should submit a separate claim form.**

**Complete all items - Insert the word NONE where applicable.**

A CLAIM SHALL BE DEEMED TO HAVE BEEN PRESENTED WHEN A FEDERAL AGENCY RECEIVES FROM A CLAIMANT, HIS DULY AUTHORIZED AGENT, OR LEGAL REPRESENTATIVE, AN EXECUTED STANDARD FORM 95 OR OTHER WRITTEN NOTIFICATION OF AN INCIDENT, ACCOMPANIED BY A CLAIM FOR MONEY DAMAGES IN A <u>SUM CERTAIN</u> FOR INJURY TO OR LOSS OF PROPERTY, PERSONAL INJURY, OR DEATH ALLEGED TO HAVE OCCURRED BY REASON OF THE INCIDENT. THE CLAIM MUST BE PRESENTED TO THE APPROPRIATE FEDERAL AGENCY WITHIN <u>TWO YEARS</u> AFTER THE CLAIM ACCRUES.

**Failure to completely execute this form or to supply the requested material within two years from the date the claim accrued may render your claim invalid. A claim is deemed presented when it is received by the appropriate agency, not when it is mailed.**

If instruction is needed in completing this form, the agency listed in item #1 on the reverse side may be contacted. Complete regulations pertaining to claims asserted under the Federal Tort Claims Act can be found in Title 28, Code of Federal Regulations, Part 14. Many agencies have published supplementing regulations. If more than one agency is involved, please state each agency.

The claim may be filled by a duly authorized agent or other legal representative, provided evidence satisfactory to the Government is submitted with the claim establishing express authority to act for the claimant. A claim presented by an agent or legal representative must be presented in the name of the claimant. If the claim is signed by the agent or legal representative, it must show the title or legal capacity of the person signing and be accompanied by evidence of his/her authority to present a claim on behalf of the claimant as agent, executor, administrator, parent, guardian or other representative.

If claimant intends to file for both personal injury and property damage, the amount for each must be shown in item number 12 of this form.

The amount claimed should be substantiated by competent evidence as follows:

*(a)* In support of the claim for personal injury or death, the claimant should submit a written report by the attending physician, showing the nature and extent of the injury, the nature and extent of treatment, the degree of permanent disability, if any, the prognosis, and the period of hospitalization, or incapacitation, attaching itemized bills for medical, hospital, or burial expenses actually incurred.

*(b)* In support of claims for damage to property, which has been or can be economically repaired, the claimant should submit at least two itemized signed statements or estimates by reliable, disinterested concerns, or, if payment has been made, the itemized signed receipts evidencing payment.

*(c)* In support of claims for damage to property which is not economically repairable, or if the property is lost or destroyed, the claimant should submit statements as to the original cost of the property, the date of purchase, and the value of the property, both before and after the accident. Such statements should be by disinterested competent persons, preferably reputable dealers or officials familiar with the type of property damaged, or by two or more competitive bidders, and should be certified as being just and correct.

*(d)* **Failure to specify a sum certain will render your claim invalid and may result in forfeiture of your rights.**

## PRIVACY ACT NOTICE

This Notice is provided in accordance with the Privacy Act, 5 U.S.C. 552a(e)(3), and concerns the information requested in the letter to which this Notice is attached.
  A. *Authority:* The requested information is solicited pursuant to one or more of the following: 5 U.S.C. 301, 28 U.S.C. 501 et seq., 28 U.S.C. 2671 et seq., 28 C.F.R. Part 14.

  B. *Principal Purpose:* The information requested is to be used in evaluating claims.
  C. *Routine Use:* See the Notices of Systems of Records for the agency to whom you are submitting this form for this information.
  D. *Effect of Failure to Respond:* Disclosure is voluntary. However, failure to supply the requested information or to execute the form may render your claim "invalid."

## PAPERWORK REDUCTION ACT NOTICE

This notice is <u>solely</u> for the purpose of the Paperwork Reduction Act, 44 U.S.C. 3501. Public reporting burden for this collection of information is estimated to average 6 hours per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the Director, Torts Branch, Attention: Paperwork Reduction Staff, Civil Division, U.S. Department of Justice, Washington, DC 20530 or to the Office of Management and Budget. Do not mail completed form(s) to these addresses.

STANDARD FORM 95 REV. (2/2007) BACK

# BakerHostetler

Baker&Hostetler LLP

Key Tower
127 Public Square, Suite 2000
Cleveland, OH  44114-1214

T  216.621.0200
F  216.696.0740
www.bakerlaw.com

## CLAIM AUTHORIZATION FORM

I, Goura Ndiaye, hereby authorize Ruth Hartman and Austin Davis of Baker & Hostetler

LLP to submit a claim under the Federal Tort Claims Act on behalf of myself to the U.S.

Department of Homeland Security, including the U.S. Immigration and Customs Enforcement,

and any other government agency, seeking compensation for the unlawful actions of them and

their employees or agents against me.

01/04/2020
Dated

Goura Ndiaye

Atlanta    Chicago    Cincinnati    Cleveland    Columbus    Costa Mesa    Denver    Houston
Los Angeles    New York    Orlando    Philadelphia    San Francisco    Seattle    Washington, DC

## 6. Date and Day of Accident

Mr. Ndiaye was detained on December 10, 2018 and deported on August 6, 2019. He was denied appropriate and necessary medical care throughout that entire time.

## 7. Time (A.M. or P.M.)

Not applicable.

## 8.  Basis of Claim / 10.  Personal Injury

I.  *Factual Basis for Claims*

### a.  Overview

Mr. Goura Ndiaye is a native of Mauritania, a county with a history of persecuting the racial and ethnic group to which he belongs.  In 1989, the government in Mauritania began revoking its black residents' citizenship, and in 1990, it deported Mr. Ndiaye because of his race. He then fled to the United States, where he lived from 2000 to 2019, for most of that time on a supervised release agreement with U.S. Immigration and Customs Enforcement (ICE).  In mid-2018, he was diagnosed with "avascular necrosis" in his left hip.  His doctors recommended surgery to replace his hip, scheduling it for January 4, 2019.  But before the hip replacement could occur, in December 2018, ICE abruptly revoked Mr. Ndiaye's release, arrested him, and caused him to miss the surgery.

ICE detained Mr. Ndiaye from December 2018 to August 2019, during which time his health rapidly deteriorated.  When he first entered detention, he only suffered from moderate pain and could still ambulate without using assistive devices.  Almont eight months later, when he was deported in August 2019, he experienced extreme pain and nearly no mobility even when using such devices full-time.

4826-6061-4831.5

In violation of ICE's internal policies, Mr. Ndiaye received no meaningful medical treatment for his hip while detained. He repeatedly sought assistance, and the doctors who examined him in custody repeated the same diagnosis and recommendations that he received before his detention. But the authorities that detained him—ICE, local ICE partners, and ICE contractor CoreCivic—never permitted this necessary surgery to occur. Instead, they only offered him Tylenol and anti-depressants.

Finally, after being denied adequate medical care for nearly eight months, he was deported in August 2019 back to Mauritania—a racist country that had never returned to him his legal right to live or work, much less one where he could receive adequate medical care.

b. **Country of Mauritania Stripped Mr. Ndiaye of Citizenship Due to His Race and Forcibly Deported Him from His Home**

Mauritania is a sparsely populated nation of 4.4 million people, with about one-third of the population in its capital city of Nouakchott and the remainder spread across the country's vast 400,000 square-mile area.[1] About 90 percent of the country is located in the Sahara Desert.[2] It borders Senegal to the south, the Moroccan-occupied Western Sahara territory to the north, Algeria to the northeast, and Mali to the southeast. As such, it sits at a traditional crossroads between lighter-skinned Berber and Arab ethnic groups to the north, and darker-skinned ethnic groups of sub-Saharan African origin to the south.

Racialized slavery along those ethnic group divides continues to this day. Thousands of so-called "black Moors," or Arabic-speaking members of sub-Saharan ethnic groups, are

---

[1] Central Intelligence Agency, *The World Factbook 2019 – Mauritania*, 2019, https://www.cia.gov/library/publications/the-world-factbook/geos/mr.html; United States Department of State, *Mauritania 2018 Human Rights Report*, 2018, https://www.state.gov/reports/2018-country-reports-on-human-rights-practices/mauritania/; Human Rights Watch, *World Report 2019 – Mauritania*, 2019, https://www.hrw.org/world-report/2019/country-chapters/mauritania.
[2] World Health Organization, *Environmental Health Challenges in Mauritania*, March 2013, https://www.who.int/features/2013/mauritania_environmental_health/en/.

2

enslaved by the dominant "white Moors" of Arab-Berber descent.[3]  Thousands more are treated to "slavery-like practices" like sexual violence and de-humanizing levels of discrimination, according to the UN special rapporteur on racism.[4]

In 1989, the racist Mauritanian government began a program of revoking the citizenship of black Mauritanians and expelling them from the country.[5]  Black Mauritanians were summoned to police stations, subjected to beatings, denied food for days, deprived of their identity cards, and loaded on trucks to neighboring Senegal.[6]  This occurred while groups organized by governmental authorities massacred hundreds of black people in Mauritania's cities.[7]

Mr. Goura Ndiaye, as a black Mauritanian, was subjected to this very treatment.  In 1990, the government revoked his citizenship and deported him to Senegal.  The government's denaturalization program lasted until 1992, government-sponsored persecution continued for years, and government-tolerated slavery and discrimination continues to this day.[8]

### c.  Arrival and Life in the United States

Despite the fact that his country of origin had deported him to Senegal, Mr. Ndiaye had neither citizenship nor the right to work there, and he could not stay.  From Senegal, he lawfully arrived at the United States on June 24, 2000.  He lived in New York City for about eight months before moving to Ohio.  His first months were defined by struggle, he knew no one in the entire

---

[3] Central Intelligence Agency, *The World Factbook 2019 – Mauritania*.
[4] Afua Hirsch, *Black Mauritanians suffer 'slavery-like' conditions, says UN*, The Guardian, Sep. 12, 2013, https://www.theguardian.com/global-development/2013/sep/12/black-mauritania-slavery-un.
[5] Rone Tempest, *In Senegal and Mauritania, Ethnic Conflict Rages Amid Talk of War*, Los Angeles Times, June 3, 1989, https://www.latimes.com/archives/la-xpm-1989-06-03-mn-831-story.html.
[6] Human Rights Watch, *HUMAN RIGHTS WATCH WORLD REPORT 1989 – Mauritania*, 1989 https://www.hrw.org/reports/1989/WR89/Mauritan.htm.
[7] *Id.*
[8] ECC Platform Library, *Communal Violence in Mauritania and Senegal 1989-1992*, accessed Jan. 8, 2020, https://library.ecc-platform.org/conflicts/mauritanians-vs-senegalese.

3

country, and he lived out of a motel. Starting at a restaurant, he worked at whatever jobs he could find in the newspaper so he could get by.

But living in Ohio gave him the opportunity to build a new life, and his story in the United States was ultimately one of success and prosperity. Mr. Ndiaye came to know the manager of the motel where he was staying—and as an electrician by trade since about 1975, he started working as maintenance staff at the motel. Over time, he established his reputation in the Columbus area as a talented electrician and worked on several landmark buildings, including new cancer research facilities at The Ohio State University. He eventually opened his own business, Ndiaye Electrician LLC, and purchased his own home in Columbus. While residing in Ohio, he paid taxes, raised three U.S.-born children, and drove a Ford F-150. He had also applied for asylum without assistance from a lawyer not long after he arrived. His application was unsuccessful, but he was granted supervised release from ICE in 2009.

### d. Mr. Ndiaye Received Avascular Necrosis Diagnosis and Treatment Plan Prior to Detention

Mr. Ndiaye's health issues began in early 2018. While he could still walk, his left hip would ignite in pain during certain activities, like driving. As the pain increasingly interfered with everyday life, Mr. Ndiaye went to the doctor. In July 2018, he received a diagnosis of "avascular necrosis" of the bone in his left hip—specifically, the head of his femur.[9] Avascular necrosis is classified as a "a chronic, degenerative and progressive" disease, per which the blood supply to a part of the bone has stopped or been dramatically reduced.[10] Without blood, the affected part of the bone dies inside the body. Injuries or certain blood conditions can lead to

---

[9] All medical records referenced herein are available upon request.
[10] "Necrosis of the Femoral Head and Health-Related Quality of Life of Children and Adolescents," *Acta Ortop Bras*. 2018; 26(4): 227–230, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6131276/.

4

avascular necrosis, but according to the Mayo Clinic, the underlying cause of this disease is unknown in 25 percent of cases.[11]

Once avascular necrosis sufficiently progresses, as it did in Mr. Ndiaye's case, then the treatment for the condition is a total replacement of the affected bone. This is exactly what Mr. Ndiaye's doctor, Dr. Robert Wetzel of the Mount Carmel Health System, recommended. Mr. Ndiaye had a pre-surgical evaluation for a total hip replacement on August 29, 2018, and Dr. Wetzel determined that he needed to improve certain health indicators, like his blood pressure, before the surgery could occur.

With physical therapy, medication and diet changes, Mr. Ndiaye did successfully improve those health indicators for the surgery. He returned to Dr. Wetzel on November 28, 2018 for a final evaluation. At that visit, Dr. Wetzel formally recommended a "left total hip arthroplasty" or replacement, and he began the process of scheduling it with surgeon Dr. Steven Cotman. Mr. Ndiaye's surgery was scheduled for January 4, 2019. But unbeknownst to him, the United States government would detain him before it could occur.

### e. Mr. Ndiaye was Detained Before His Surgery Could Occur

Since 2009, Mr. Ndiaye dutifully attended his scheduled immigration check-ins without incident. But at his regular appointment on December 10, 2018, ICE abruptly revoked his supervised release status and arrested him. Mr. Ndiaye then spent the next eight months in several places of detention, including multiple sheriffs' offices and ICE facilities in Ohio and across the country.

Upon the request of ICE, Mauritania had issued a *laissez-passer* travel document on Mr. Ndiaye's behalf and provided it to the United States government. *Laissez-passer* documents can

---

[11] Mayo Clinic, "Avascular necrosis," May 5, 2018, https://www.mayoclinic.org/diseases-conditions/avascular-necrosis/symptoms-causes/syc-20369859.

be used in lieu of a passport to allow for one-way or one-time travel to a country.  It did not

reinstate Mr. Ndiaye's citizenship, permit him to receive a Mauritanian passport, or convey any

rights to him in Mauritania.  But with the document, the Mauritanian government would now

receive him into the country despite his lack of legal status there.  This was a new development

since 1990.

After his arrest by ICE, Mr. Ndiaye pursued several immigration-related legal actions to

prevent his return to Mauritania.  He was granted an emergency stay of removal on January 4,

2019, as well as a stay of removal from the Board of Immigration Appeals, and the *laissez-

passer* document eventually expired on March 1, 2019.  As of January 2020, his asylum case is

currently awaiting submission before a panel of the Sixth Circuit (*Ndiaye v. Barr*, No. 19-3524

(6th Cir.)).  But even while Mr. Ndiaye's immigration case continued, the Mauritanian

government re-issued the laissez-passer document on June 21, 2019, and ICE deported him on

August 6, 2019.

### f.  ICE and Sheriffs' Offices Failed to Provide Adequate, Reasonable Medical Care for Mr. Ndiaye's Health Condition

Mr. Ndiaye was detained for eight months, from December 2018 to August 2019.  For the

first four months following his arrest, he was moved repeatedly between facilities in Louisiana,

Arizona, and around Ohio.  He spent the majority of that period back and forth between two

Ohio sheriffs' jails: one in Butler County and one in Morrow County.  In April 2019, he arrived

at the CoreCivic-operated Northeast Ohio Correctional Center (NEOCC) in Youngstown, Ohio,

where he was detained until his deportation.

Because of his detention in December 2018, Mr. Ndiaye missed his January 2019

scheduled surgery.  He remained in debilitating pain, and, despite his doctor's recommendation,

6

no surgery was ever re-rescheduled.  In fact, his pain increased to the point where he fainted because of it on multiple occasions while in custody, but no treatment was forthcoming.

At each facility where he was detained, he reported his scheduled surgery, his diagnosis, and his pain levels to the relevant authorities.  In March 2019, he was permitted to see another specialist doctor at the TriHealth system in West Chester, Ohio.  There, Dr. Charles Herfel diagnosed what Dr. Wetzel at Carmel had diagnosed some eight months prior: "partial collapse of the femoral head . . . most compatible with avascular necrosis . . . mild to moderate degenerative change in the left hip joint."  A letter included with Mr. Ndiaye's medical notes from that day also states: "Goura was evaluated in office today by Dr. [Scott] Slivka.  His left hip needs replaced."  But he was never permitted to have that surgery while in detention, despite multiple doctors' recommendations and his diagnosed medical need.

The situation did not improve after Mr. Ndiaye moved to NEOCC in April 2019.  A review of the NEOCC medical records in Mr. Ndiaye's possession show ten separate occasions on which he discussed his pain and his condition with the appropriate medical authorities: "left hip pain," "chronic L hip pain" and "left leg pain hip issue."  In Mr. Ndiaye's words, as recorded by NEOCC: "I have left hip pain and was to have it replaced before I came here," and "I have lot of pain to my left hip and down my leg.  Hurts to walk, sleep at night."

Not only were the authorities aware of his condition, but they also confirmed it with a third-party x-ray on May 9, 2019.  Dr. James Esser of Cavalier Mobile X-Ray reviewed Mr. Ndiaye's x-ray and wrote: "crescentic subchondral sclerotic and cystic change and partial collapse of the weightbearing aspect of the femoral head appears consistent with advanced AVN [avascular necrosis]."  The fact that his diagnosis had sunk from "mild to moderate" in March to

"advanced" in May demonstrates how badly Mr. Ndiaye's quality of life had deteriorated while in detention; his condition had objectively worsened.

An entry on Mr. Ndiaye's inmate medical chart from May 22, 2019 goes into further detail about ICE's awareness of his condition and the appropriate treatment. It accepts his diagnosis of "Avascular Necrosis of the left hip" and acknowledges that alternative physician-supervised routes of treatment had failed: "Detainee was scheduled to undergo his total hip arthoplast [hip replacement] on 1/4/2019 after unsuccessful trial of NSAIDS, coricosteriod treatment, and physical therapy and reccomendation [sic] from Orthopaedic physician."

Without a doubt, ICE and its contractors at NEOCC were aware of Mr. Ndiaye's condition, its advanced stage, the immense pain it caused, the multiple doctors' recommendations that the appropriate treatment was a hip replacement, and the failure of alternatives to surgery. But instead of allowing Mr. Nidaye to receive the treatment his doctors recommended, they repeated an ineffective, insufficient course of treatment that had already failed to address Mr. Ndiaye's necrotic tissue: Tylenol and anti-inflammatories. He was also prescribed anti-depressants for their potential pain management secondary effects, though he refused them as inadequate. In terms of treatment for advanced avascular necrosis that caused pain to the point of fainting, he was plainly correct.

### g. ICE's Own Medical Policies Required It to Provide Appropriate Medical Care, Especially to Detainees with Chronic Conditions

ICE (and CoreCivic as its contractor at NEOCC) violated ICE's internal medical standards by failing to provide Mr. Ndiaye proper medical care during his detention. ICE regulates its own treatment under a series of internal policies: the 2000 National Detention Standards (NDS), the 2008 Performance-Based National Detention Standards (PBNDS) and the

8

2011 PBNDS (amended in 2016). Together, there is no doubt that ICE has committed itself to ensuring that its detainees receive the medical care recommended by their treating physicians.

ICE standards state that each detainee is ensured "access to appropriate and necessary" medical care,[12] specifically including "treatment"[13] and "specialized health care."[14] In particular, the standards require every facility to provide detainees "[m]edically necessary and appropriate medical . . . services," "[c]omprehensive, routine and preventive health care, as medically indicated," "[s]pecialty health care," "[t]imely responses to medical complaints," and "hospitalization as needed within the local community."[15] The appropriate medical treatment is determined by health care specialists.[16] If providing the appropriate, doctor-recommended treatment for avascular necrosis was beyond the resources of the detention facility, policy dictated that Mr. Ndiaye should have been transferred.[17] As the standards put it, in short: "Health care needs will be met."[18]

The chronic nature of Mr. Ndiaye's avascular necrosis should have elevated his importance within the ICE medical framework. Under ICE's standards, "[d]etainees with chronic conditions shall receive care and treatment, as needed."[19] Especially relevant to Mr. Ndiaye's progressively disabling disease, "[d]etainees with chronic conditions will receive care

---

[12] U.S. Immigration and Customs Enforcement [ICE], "2008 Operations Manual ICE Performance-Based National Detention Standards," 2008, https://www.ice.gov/detention-standards/2008; ICE, "2011 Operations Manual ICE Performance-Based National Detention Standards, Revised December 2016," Dec. 2016, https://www.ice.gov/detention-standards/2011.

[13] ICE, "2008 Operations Manual"; ICE, "2011 Operations Manual".

[14] ICE, "2000 Detention Operations Manual," 2000, https://www.ice.gov/detention-standards/2000. While ICE has also released its "2019 National Detention Standards for Non-Dedicated Facilities," they do not appear to have been in effect at the times and in the locations applicable to Mr. Ndiaye.

[15] ICE, "2011 Operations Manual."

[16] "A health care specialist shall determine medical treatment, except when there is disagreement on the type or extent of treatment that is medically necessary." ICE, "2000 Detention Operations Manual."

[17] "A detainee who is determined to require health care beyond facility resources shall be transferred in a timely manner to an appropriate facility." ICE, "2008 Operations Manual;" ICE, "2011 Operations Manual."

[18] ICE, "2008 Operations Manual."

[19] ICE, "2011 Operations Manual."

and treatment for conditions where non-treatment would result in negative outcomes or permanent disability as determined by the clinical medical authority."[20]  This care must be "in accordance with a written treatment plan conforming to accepted medical practices for the condition in question, approved by a licensed physician."[21]  But Mr. Ndiaye's doctors before and during detention (ie "medical authorities") all recommended a hip replacement as necessary treatment for his avascular necrosis (ie "care and treatment, as needed"), and the effects of withholding that necessary surgery have been debilitating (ie non-treatment resulting in "negative outcomes or permanent disability").  Yet Mr. Ndiaye never received the care for his chronic condition to which ICE standards would entitle him.

### h.  Mr. Ndiaye was Deported to Mauritania Despite Absence of Medical Infrastructure and Having No Essential Rights

Finally, in August 2019, after almost eight months in U.S. custody, ICE deported Mr. Ndiaye to Mauritania.  The circumstances surrounding the deportation further underscore ICE's awareness of his need for treatment.  First, per its own protocol, ICE was required to initiate a pre-deportation internal process which results in a formal "determination letter" advising on whether medical care is available in a given destination country and "taking into consideration the ease of access and affordability."[22]  No such letter appears to have been written.  If it had, it would have necessarily discussed the total lack of appropriate medical infrastructure in Mauritania—and how Mr. Ndiaye would be unable to access any present medical services due to his race and lack of citizenship.  Second, Mr. Ndiaye was told by ICE officers that he was leaving detention and travelling elsewhere to finally obtain appropriate medical care.

---

[20] *Id.*

[21] *Id.*

[22] ICE, "Availability of Health Care," *ICE Health Service Corps*, Mar. 18, 2016, http://www.documentcloud.org/documents/6025417-IHSC-Policy-Availability-of-Health-Care.html.

10

Presumably, ICE officers told him this because his need was so evident, and the only reasonable course of action at that point would be to allow him to receive his necessary hip replacement.

But instead, ICE sent Mr. Ndiaye to an unfamiliar nation where he had no citizenship rights. In Mauritania, basic rights and access to public services are contingent on the possession of state identification papers, which require citizenship. Mr. Ndiaye is prohibited from working and owning property in Mauritania, and again, his access to public services like hospitals is extremely curtailed. These formalistic restrictions on non-citizens are separate from and linked to the racist discrimination, abuse, and de-facto enslavement committed against dark-skinned people like Mr. Ndiaye. Yet he was still granted medical clearance for deportation, in apparent disregard of ICE's internal policy requiring removal officers to determine the availability of health care in destination countries.[23]

As such, and in a repeat of his experience in 1990, Mr. Ndiaye was again forced to flee from Mauritania to Senegal in 2019. He is currently staying with his daughter in Senegal; she was born Mauritania, was forced to move with him in 1990 to Senegal when she was three and stayed in Senegal while he came to the United States. While he still cannot legally work and his access to medical services or basic medicine remains extremely limited, Senegalese society does not discriminate against him based on his race like Mauritania did.

### i. Today, Mr. Ndiaye Languishes in Pain Made Worse During Detention and Without Access to Medical Infrastructure

But his health has only gotten worse. Today, Mr. Ndiaye can barely move. He requires the use of a cane to ambulate at all, which was not the case before he entered detention. And even minor movement with the cane is accompanied by extreme and debilitating pain, which shoots all the way down his leg to his calf with every step he takes.

---

[23] *Id.*

This deterioration demonstrably came about during Mr. Ndiaye's time in detention: his condition was left untreated, was exacerbated by conditions in detention, and worsened from "mild to moderate" to "advanced." He suspects that the deterioration is in no small part a result of the painfully hard beds on which he was forced to sleep and spend many of his waking hours.

He cannot measure the exact level of deterioration because he was deported to a country without adequate medical infrastructure for his condition and then was forced to flee to another such county. ICE medically cleared him to be shipped to Mauritania despite the total absence of adequate medical facilities there, and despite his status in Mauritania as a non-citizen who cannot access services even if they existed. This appears to violate its own standards, under which it pledged to provide detainees under its control with appropriate medical care prescribed by treating physicians—especially if their conditions were chronic.

## II.  *Legal Basis for Claim*

### a.  **Negligence, Gross Negligence, and Recklessness**

ICE had a duty to provide medical care to Mr. Ndiaye while in detention. Again, this duty is set forth in ICE's internal polices, including, but not limited to: the 2000 National Detention Standards (NDS), the 2008 Performance-Based National Detention Standards (PBNDS), and the 2011 PBNDS (amended in 2016). In direct violation of the foregoing, ICE failed to provide Mr. Ndiaye with appropriate medical care and showed a deliberate indifference to his serious medical needs.

As a direct and proximate result of ICE and related agents' negligent and reckless acts, omissions, and conduct, Mr. Ndiaye's health has worsened significantly. ICE and the related authorities which had a duty of care to Mr. Ndiaye should have followed ICE's own internal policies and allowed Mr. Ndiaye to receive the appropriate treatment as determined by his

doctors: a total hip replacement. Instead, as documented above, his condition dramatically worsened from mild/moderate to advanced avascular necrosis. While he entered detention walking without a cane, he can barely walk at all even with a cane today. He can no longer physically work because every movement he makes is accompanied by tremendous pain, and the pain has caused him to lose consciousness on multiple occasions. Mr. Ndiaye has suffered extreme mental and emotional pain and distress, medical expenses, the loss of the potential to earn a living, and other harms.

### b. Negligent employee supervision

ICE also had a duty to provide adequate management supervision: to make sure its employees, agents, and contractors would not cause harm to third parties while in ICE's employ. Those employees failed to ensure Mr. Ndiaye received medically necessary and appropriate treatment while he was in their custody, despite multiple doctors' recommendations and in direct violation of their own internal policies. Mr. Ndiaye repeatedly sought medical assistance for his pain, but rather than follow ICE policies and arrange for proper medical treatment, ICE employees only provided him with over-the-counter remedies like Tylenol. ICE and other authorities' negligence in supervising their employees violated their duty of care to Mr. Ndiaye and caused the profound deterioration of his avascular necrosis, as described herein. As a result of their failure to supervise, Mr. Ndiaye experienced and still experiences the above forms of suffering and their debilitating effects on his life.

### c. Intentional and Negligent Infliction of Emotional Distress

ICE and its agents had internal policies governing the medical care of its detainees, including provisions that stated the ICE's clinic would "negotiate and keep current arrangements with nearby medical facilities or health care providers to provide required health care not

13

available within the facility." ICE deliberately violated those policies. ICE knew, or should have known, that its extreme and outrageous disregard for its internal policies regarding the medical care of its detainees would cause emotional distress among detainees like Mr. Ndiaye, who suffered from a chronic debilitating condition.

In Mr. Ndiaye's instance, he had a surgery scheduled for January 4, 2019. He advised ICE of this appointment, but they ignored it. Throughout his time in detention, he repeatedly sought appropriate medical care but was denied the necessary surgery to alleviate his pain and walk effectively again. Even doctors who examined Mr. Ndiaye in custody agreed that hip replacement surgery was required. Yet ICE made no efforts to assist Mr. Ndiaye in receiving the treatment he required. As a result of ICE's intentional and negligent actions, Mr. Ndiaye has suffered severe emotional distress as his health condition worsened in U.S. custody, and he is unable to receive the appropriate treatment.

## 11. Witnesses

Possible witnesses relevant to Mr. Ndiaye's claim include: Dr. Robert Wetzel, Mount Carmel Health System; Dr. Steven Cotman, Mount Carmel Health System; Dr. Charles Herfel, TriHealth; Dr. Scott Slivka, TriHealth; Dr. James Esser, Cavalier Mobile X-Ray; Teresa Hawn, CMA, TriHealth Health System; Jennifer Carrera, RN, ICE Florence Service Processing Center, Florence, AZ; Marissa Newbauer-Hoppel, FNP-C, CoreCivic; Danielle Slupski O'Connell, PA-C, OhioHealth; Julie Boatman, DO, Mount Carmel Health System; Teresa Hawn, CMA, TriHealth Health System; Rita M. Thomas, Butler Counter Sheriff's Office Medical Division; Nichol Davis, LPN, CoreCivic; "D. Cooper," RN, CoreCivic; Renee Sferra, ACNS-B,

14

CoreCivic; Debra Cooper, RN, CoreCivic; Steve Purdy, P.A., Butler County Sheriff's Office; Dr. James Giovino, M.D., CoreCivic; Nicole Gibson, RN, CoreCivic.

This is not and should not be construed as an exhaustive list of possible witnesses, Mr. Goura reserves the right to add additional witnesses during the course of discovery.