# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF OHIO
# EASTERN DIVISION

| | |
|---|---|
| GOURA NDIAYE, | Case No. 4:20-cv-01703 |
| Plaintiff, | Judge J. Philip Calabrese |
| v. | Magistrate Judge Kathleen B. Burke |
| UNITED STATES OF AMERICA, *et al.*, | |
| Defendants. | |

## OPINION AND ORDER

Defendant CoreCivic, Inc. is a Maryland corporation that contracted with United States Immigration and Customs Enforcement to house detainees and provide medical services to detainees at the Northeast Ohio Correction Center, where Plaintiff Goura Ndiaye was detained for a few months after his arrest in December 2018 before his deportation in August 2019.  Plaintiff asserts several causes of action against CoreCivic and the United States of America, claiming he was denied medical treatment for a necrotic hip bone while detained.  (ECF No. 1.)  CoreCivic moves to dismiss the federal claims against it and also asks the Court to decline to exercise supplemental jurisdiction over the State law claims.  (ECF No. 6.)  For the reasons that follow, the Court **GRANTS IN PART AND DENIES IN PART** the motion.

### STATEMENT OF FACTS

On this motion to dismiss, the Court takes the following allegations in the first amended complaint as true and construes them in Plaintiff's favor.

Mr. Ndiaye is from Mauritania in Northwest Africa. The country is home to "lighter-skinned Berber and Arab ethnic groups to the north and darker-skinned ethnic groups of sub-Saharan African origin to the south." (ECF No. 1, ¶ 11, PageID #4.) The "dominant 'white Moors' of Arab-Berber descent" subject the "'black Moors,' or Arabic-speaking members of sub-Saharan ethnic groups" to slavery, sexual violence, and discrimination. (*Id.*) In 1989, Mauritania began revoking the citizenship of Black Mauritanians, like Mr. Ndiaye, and expelling them from the country. (*Id.*, ¶ 12.) The government revoked Mr. Ndiaye's citizenship in 1990 and deported him to Senegal. (*Id.*, ¶ 13, PageID #5.) From Senegal, Mr. Ndiaye fled to the United States, arriving lawfully in 2000. (*Id.*, ¶ 14.)

While in the United States, Mr. Ndiaye's application for asylum was denied, but he was granted an Order of Supervision from ICE in 2009. (*Id.*) He lived in the Columbus, Ohio area, where he worked as an electrician, purchased a home, started a family, and "dutifully attended his scheduled immigration check-ins under his agreement with ICE without incident" until December 10, 2018. (*Id.*, ¶¶ 15–16.) On that day, "ICE abruptly revoked his supervised release status and arrested him." (*Id.*, ¶ 16.) He was detained for eight months, from December 2018 to August 2019. (*Id.*, ¶ 27, PageID #8.) For the first four months, Mr. Ndiaye was detained in various locations and at the Northeast Ohio Correctional Center in Youngstown, Ohio for the last four months. (*Id.*, ¶ 28.) CoreCivic operates the Correctional Center. (*Id.*)

In July 2018, before his arrest, Mr. Ndiaye was diagnosed with "avascular necrosis," meaning he suffered from a necrotic hip bone "rotting inside his body,"

2

which "caus[ed] him tremendous pain since 2018." (*Id.*, ¶¶ 1 & 22, PageID #2 & 7.) The disease is "chronic, degenerative and progressive," and the underlying cause is often unknown, as is the case here. (*Id.*, ¶ 23, PageID #7.) Mr. Ndiaye had a hip replacement surgery scheduled for January 4, 2019, just under a month after his arrest, to treat the disease. (*Id.*, ¶ 17, PageID #6.) He did not receive the surgery due to his arrest and detention and his surgery was never completed while he was detained. (*Id.*, ¶ 30, PageID #8.)

Mr. Ndiaye reported his diagnosis, need for surgery, and pain levels at each detention facility, but never received adequate treatment for his condition. (*Id.*, ¶¶ 29 & 32, PageID #8 & 9.) While detained, doctors again diagnosed Mr. Ndiaye with avascular necrosis in the left hip joint, noted that his condition had worsened from mild or moderate to advanced, and advised that he needs a left hip replacement. (*Id.*, ¶¶ 31 & 33.) For his condition, detention officials merely provided Mr. Ndiaye with Tylenol, anti-inflammatories, and anti-depressants to help him manage the pain. (*Id.*, ¶¶ 36–37, PageID #10.)

"After his arrest by ICE, Mr. Ndiaye pursued several immigration-related legal actions to prevent his return to Mauritania." (*Id.*, ¶ 19, PageID #6.) None were successful, and ICE deported Mr. Ndiaye to Mauritania on August 6, 2019. (*Id.*, ¶¶ 19–21.) Although not a citizen of Mauritania, the Mauritanian government issued him *laissez-passer* documents that permitted him to travel to the country without reinstating his legal citizenship. (*Id.*, ¶¶ 18 & 20.) Because he is a non-citizen of Mauritania, he is prohibited from working and owning property there and lacks easy

3

access to medical care. (*Id.*, ¶ 45, PageID #13.) Although its policy requires "removal officers to determine the availability of health care in destination countries," ICE granted medical clearance for Mr. Ndiaye's deportation to Mauritania. (*Id.*, ¶ 46.)

After he was deported to Mauritania, Mr. Ndiaye was "forced to flee" to Senegal, where he stays with his daughter. (*Id.*, ¶ 47.) Even there, "he still cannot legally work and his access to medical services or basic medicine remains extremely limited . . . ." (*Id.*) His health continues to deteriorate, and he suffers debilitating pain. (*Id.*, ¶ 48, PageID #14.)

## STATEMENT OF THE CASE

Based on these allegations, Plaintiff pleads eleven claims, five of which he asserts against Defendant CoreCivic: (1) medical negligence (Count II); (2) negligent employee hiring, training, and supervision (Count IV); (3) intentional infliction of emotional distress (Count VI); (4) gross negligence (Count VIII); and (5) violation of 29 U.S.C. § 794, the Rehabilitation Act (Count XI). Plaintiff invokes the Court's federal question jurisdiction over the Rehabilitation Act claim pursuant to 28 U.S.C. § 1331 and supplement jurisdiction over the State law claims pursuant to 28 U.S.C. § 1367. (*Id.*, ¶ 8, PageID #3.) CoreCivic moves to dismiss the federal claim under the Rehabilitation Act and asks the Court to decline the exercise of supplemental jurisdiction over the State law claims. ([ECF No. 6](ECF No. 6).)

## ANALYSIS

At the motion to dismiss stage in any civil action, a complaint must "state[] a claim for relief that is plausible, when measured against the elements" of a claim. *Darby v. Childvine, Inc.*, 964 F.3d 440, 444 (6th Cir. 2020) (citing *Binno v. American*

*Bar Ass'n*, 826 F.3d 338, 345–46 (6th Cir. 2016)). A complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). To survive a motion to dismiss, a complaint must "raise a right to relief above the speculative level" into the "realm of plausible liability." *Twombly*, 550 U.S. at 555.

When analyzing a complaint under this standard, the Court construes factual allegations in the light most favorable to the plaintiffs, accepts them as true, and draws all reasonable inferences in the plaintiffs' favor. *Wilburn v. United States*, 616 F. App'x 848, 852 (6th Cir. 2015). But a pleading must offer more than mere "labels and conclusions," because "a formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). Nor is a court required to accept "[c]onclusory allegations or legal conclusions masquerading as factual allegations[.]" *Eidson v. Tennessee Dep't of Child.'s Servs.*, 510 F.3d 631, 634 (6th Cir. 2007).

Therefore, the Court must distinguish between "well-pled factual allegations," which must be treated as true, and "naked assertions," which need not. *See Iqbal*, 556 U.S. at 678 ("Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement.") (cleaned up); *see also, e.g.*, *Center for Bio-Ethical Reform, Inc. v. Napolitano*, 648 F.3d 365, 375 (6th Cir. 2011) (determining that,

5

because some of the plaintiff's factual allegations were "not well-pleaded[,]" "their conclusory nature 'disentitles them to the presumption of truth'"). Rule 8 "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678–79.

## I. The Rehabilitation Act

The Rehabilitation Act prohibits "any program or activity receiving Federal financial assistance" from discriminating on the basis of a disability. 29 U.S.C. § 794(a). It permits any aggrieved party to pursue "[t]he remedies, procedures, and rights set forth in section 717 of the Civil Rights Act of 1964 . . . ." 29 U.S.C. 794a(a). To establish a prima facie case of discrimination in violation of the Act, a plaintiff must show that (1) the plaintiff is handicapped within the meaning of the Act; (2) the plaintiff is otherwise qualified to participate in the program or activity; (3) the plaintiff was excluded because of his or her handicap; and (4) the defendant is a recipient of federal financial assistance. *G.C. v. Owensboro Pub. Sch.*, 711 F.3d 623, 635 (6th Cir. 2013).

Defendant's primary argument for dismissing the Rehabilitation Act claim hinges on the meaning of three words in the Act: "Federal financial assistance." ([ECF No. 6](), PageID #78–80.) The Act provides, in relevant part:

> No otherwise qualified individual with a disability in the United States, as defined in section 7(20), shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 793(a). The statute itself does not define "Federal financial assistance."

6

For guidance, the Sixth Circuit looks to the Code of Federal Regulations. *Gallagher v. Croghan Colonial Bank*, 89 F.3d 275, 277–78 (6th Cir. 1996) (applying 28 C.F.R. § 41.3(e) to Rehabilitation Act claim). The Regulations provide two similar definitions of "Federal financial assistance" relevant to the Department of Justice's implementation of the Act. 28 C.F.R. § 41.3(e); 28 C.F.R. 42.540(f). Section 42.540 "applies to each recipient of Federal financial assistance from the Department of Justice and to each program or activity receiving such assistance," 28 C.F.R. § 42.502, and Section 41.3 "applies to each Federal department and agency that is empowered to extend Federal financial assistance," 28 C.F.R. § 41.2. Because CoreCivic is alleged to be a recipient of Federal financial assistance, the Court looks to Section 42.540, which defines the phrase to mean:

> [A]ny grant, cooperative agreement, loan, contract (other than a direct Federal procurement contract or a contract of insurance or guaranty), subgrant, contract under a grant or any other arrangement by which the Department provides or otherwise makes available assistance in the form of:
>
> (1)   Funds;
>
> (2)   Services of Federal personnel;
>
> (3)   Real and personal property or any interest in or use of such property . . . ; [and]
>
> (4)   Any other thing of value by way of grant, loan, contract or cooperative agreement.

28 C.F.R. 42.540(f). Further, the United States District Court for the District of Columbia and the Ninth, Tenth, and Eleventh Circuits have concluded that "Federal financial assistance" includes the federal government's provision of a subsidy but not

7

compensation for services provided. *Estate of Earnest Boyland v. Young*, 242 F. Supp. 3d 24, 29–29 (D.D.C. 2017) (collecting cases).

According to CoreCivic, it is "a private prison company that contracts with the federal government to house federal detainees and is not subject to suit under the Rehabilitation Act" because "it does not receive 'Federal financial assistance' within the meaning of the Rehabilitation Act." (ECF No. 6, PageID #78.) Plaintiff insists that Defendant's financial relationship with the federal government is a question of fact that cannot be resolved on a Rule 12 motion. (ECF No. 8, PageID #95.)

Indeed, many of the cases CoreCivic relies on were resolved after the Rule 12 phase with the benefit of some evidence. But CoreCivic also provides several cases that dismissed Rehabilitation Act claims on a motion to dismiss. (ECF No. 6, PageID #78; ECF No. 12, PageID #158.) The majority of those cases rely on a 2014 case from the District Court of the District of Columbia, *Lee v. Corrections Corp. of America*, 61 F. Supp. 3d 139 (D.D.C. 2014). *See Abdus-Sabur v. Hope Village, Inc.*, 221 F. Supp. 3d 3, 9 (D.D.C. 2016); *Goodman v. Robert A. Deyton Det. Facility*, No. 1:15-CV-1724, 2015 2015 WL 5480046, at *4–5 (N.D. Ga. Sep. 14, 2015); *Estate of Earnest Boyland v. Young*, 242 F. Supp. 3d 24, 28–29 (D.D.C. 2017); *Lee v. Seed Pub. Charter Sch. of Wash.*, No. 18-2786 , 2020 WL 4923619, at *4–5 (D.D.C. Aug. 21, 2020).

Because *Lee v. Corrections Corp. of America* is the source of the majority of the rulings on which Defendant relies, the Court examines that case in greater detail. In *Lee*, the court dismissed the plaintiff's Rehabilitation Act claim brought against a "private prison that incarcerates inmates in the custody of the D.C. Department of

8

Corrections." *Lee*, 61 F. Supp. 3d at 141. The court concluded that the defendant received "federal funding through its contracts with the Bureau of Prisons and U.S. Marshals Service" but did not receive "'Federal financial assistance' within the meaning of the Rehabilitation Act." *Id.* at 144. It reasoned that courts define "Federal financial assistance" to mean the "government's provision of a subsidy to an entity" and noted that "plaintiff does not allege that defendant receives subsidies from the federal government . . . ." *Id.*

Based on *Lee* and the cases that follow it, the Rehabilitation Act does not apply here. Plaintiff alleges that "CoreCivic received federal financial assistance under its agreements with ICE for the purpose of immigration detention activities. Mr. Ndiaye was detained by CoreCivic pursuant to those activities." (ECF No. 1, ¶ 114, PageID #25.) Further, he alleges that "CoreCivic entered a contract with ICE to, among other things, house detainees and operate and provide medical services to detainees at the Northeast Ohio Correctional Center (NEOCC), where [he] was held . . . ." (*Id.*, ¶ 6, PageID #3.) This type of financial arrangement is not a federal subsidy, but compensation for CoreCivic's provision of services. As a matter of law, the Rehabilitation Act does not apply.

Plaintiff does not address *Lee v. Correction Corp. of America*, but directs the Court to the definition of "Federal financial assistance" the Department of Homeland Security uses for Title VI of the Civil Rights Act of 1964. (ECF No. 8, PageID #99.) Under that definition, "Federal financial assistance" includes "[a]ny Federal agreement, arrangement, or other contract which has as one of its purposes the

9

provision of assistance." 6 C.F.R. 21.4(c)(5). Under this definition, Plaintiff argues that CoreCivic qualifies "as a recipient of federal financial assistance if a single purpose of its funding was for 'assistance.'" (ECF No. 8, PageID #99.) Even if this definition applies to the Rehabilitation Act, it does not change the Court's conclusion. As in *Lee*, there is no basis to conclude as a matter of law that Defendant's financial agreements with the federal government amount to "assistance" or a "subsidy."

In addition, Plaintiff relies on *Committee for Immigrant Rights of Sonoma County v. County of Sonoma*, 644 F. Supp. 2d 1177 (N.D. Cal. 2009). (ECF No. 8, PageID #100.) In that case, the plaintiff's claim under the Rehabilitation Act survived a Rule 12 motion. 644 F. Supp 2d at 1206–07. But the case alleged a financial relationship between the federal government and the county of a State—a fundamentally different financial relationship than the one between the federal government and CoreCivic. Plaintiff does not explain how that relationship would compel a similar result here. Plaintiff may be correct that "Federal financial assistance" encompasses a broad range of services the federal government provides, including medical services through Medicare or Medicaid. (ECF No. 8, PageID #97–98.) But here Defendant CoreCivic provides services to the federal government. (ECF No. 1, ¶ 6, PageID #3.) Accordingly, Plaintiff's claim under the Rehabilitation Act against CoreCivic fails as a matter of law.

## II. Supplemental Jurisdiction

Having dismissed the only federal claim against CoreCivic, the Court next considers whether to exercise supplemental jurisdiction over the State law claims against CoreCivic. A court may exercise supplemental jurisdiction over related

claims that "form part of the same case or controversy" as any claim over which the court has original jurisdiction. 28 U.S.C. § 1367(a). Further, Section 1367(c)(3) provides that a district court may decline to exercise supplemental jurisdiction where "(1) the claim raises a novel or complex issue of State law, (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction; (3) the district court has dismissed all claims over which it has original jurisdiction, or (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction." In deciding whether to exercise supplemental jurisdiction, the district court should consider factors such as "comity, judicial economy, convenience, and fairness." *Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, 196 F.3d 617, 620–21 (6th Cir. 1999).

After reviewing the record in this matter, the Court will not exercise its discretion to decline supplemental jurisdiction over Plaintiff's State law claims against Defendant CoreCivic. In this matter, federal claims remain against the United States, and Plaintiff's claims against both Defendants involve the same set of facts and circumstances such that there is one case or controversy between the parties. Moreover, the remaining claims do not raise novel issues of State law, and no exceptional circumstance applies. Additionally, the international dimension of the case is better suited for resolution in federal court. And discovery has been underway for several months already and the Court finds that retaining jurisdiction best serves the ends of judicial economy and the convenience of the parties by resolving all claims comprising the same case or controversy and avoiding piecemeal litigation.

11

As for Defendant's reliance on *Musson Theatrical v. Federal Express Corp.*, 89 F.3d 1244 (6th Cir. 1996), that case involved many circumstances that do not exist here. For example, a State action was already pending, which the court found "extremely compelling" in concluding that the district court abused its discretion by exercising supplemental jurisdiction. *Id.* at 1256. In addition, the court considered "the simple fact that the [S]tate law claims were never actually pled" in the district court. *Id.* Simply put, *Musson* neither requires nor persuades the Court to decline to exercise jurisdiction.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** Defendant CoreCivic, Inc.'s motion to dismiss (ECF No. 6). Count XI is dismissed, but the remaining State claims against CoreCivic shall proceed.

**SO ORDERED.**

Dated: September 28, 2021

          J. Philip Calabrese
          United States District Judge
          Northern District of Ohio